## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

### Case No. 1:19-CV-00070-AW-GRJ

DIANNA YODER, CLINT WALDING,
and KELLEY WILLIAMS, individually
and on behalf of others similarly situated,

      Plaintiffs,

v.

FLORIDA FARM BUREAU, FLORIDA FARM
BUREAU GROUP, FLORIDA FARM BUREAU
FEDERATION, FLORIDA FARM BUREAU
CASUALTY INSURANCE COMPANY, FLORIDA
FARM BUREAU GENERAL INSURANCE
COMPANY, SOUTHERN FARM BUREAU
CASUALTY INSURANCE COMPANY, and
SOUTHERN FARM BUREAU LIFE INSURANCE
COMPANY,

      Defendants.

---

## DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION OF COLLECTIVE ACTION AND COURT-AUTHORIZED NOTICE

---

# **TABLE OF CONTENTS**

*Page*

INTRODUCTION ............................................................................1

FACTUAL BACKGROUND ..........................................................3

STANDARD OF REVIEW ...........................................................10

SUMMARY OF ARGUMENT ......................................................13

ARGUMENT AND AUTHORITIES..............................................15

I.    PLAINTIFFS FAILED TO DEMONSTRATE THAT THE PUTATIVE CLASS MEMBERS ARE SIMILARLY SITUATED .............15

    A.    Individualized Determinations Regarding Independent Contractor Status Preclude Certification.............................................17

    B.    Individualized Determinations Regarding FLSA Exemptions Preclude Certification.........................................................................22

    C.    Plaintiffs Failed To Establish That Conditional Certification Of A Statewide Collective Action Is Warranted ......................................24

II.   IN THE ALTERNATIVE, THE COURT SHOULD DENY THE MOTION BECAUSE IT FAILS TO SATISFY RULE 23'S GOVERNING STANDARD FOR *ALL* FORMS OF REPRESENTATIVE LITIGATION...........................................................25

    A.    Rule 23 Governs "All" Representative Proceedings, Including Those Brought Pursuant to the FLSA .................................................26

    B.    Application Of Rule 23 Better Serves The Due Process, Fairness, and Efficiency Concerns Intrinsic To Representative Litigation........29

    C.    While The Two-Stage Methodology Is Prevalent, Courts Employing More Reasoned Analysis Conclude That Rule 23 And Its Principles Should Apply.........................................................31

D.      Plaintiffs Do Not Satisfy Rule 23's Requirements ............................32

CONCLUSION ........................................................................................33

CERTIFICATE OF COMPLIANCE........................................................35

CERTIFICATE OF SERVICE ................................................................35

# **INTRODUCTION**[1]

Plaintiffs are three former insurance agents who entered into independent contractor agreements to market and sell insurance products offered by Florida Farm Bureau Casualty Insurance Company, Florida Farm Bureau General Insurance Company, and Southern Farm Bureau Life Insurance Company (collectively, "Defendants").[2]   Plaintiffs and two opt-ins[3] worked in only <u>four</u> of the 94 Farm Bureau offices around the State, and were supervised by just <u>three</u> of 42 Agency Managers ("AMs") managing these offices.   Plaintiffs, however, seek authorization to send notice to a proposed "class" of approximately 216 current and former agents throughout Florida, on grounds they have sufficiently shown that each of those agents is "similarly situated" to them when judged under a "lenient" standard.

Plaintiffs are wrong.  Their case presents two core questions: (i) Was every proposed class member misclassified as an independent contractor?; and if so,

---

[1] All record citations not previously contained in the docket are to the Defendants' contemporaneously filed Appendix, cited by the declarant's last name, followed by the corresponding paragraph and exhibit number, if any. *E.g.*, "Lentz, ¶X, Exh. Y." Unless otherwise noted, all internal citations are omitted and all emphasis is added.

[2] Plaintiffs did not contract with Defendant Southern Farm Bureau Casualty Insurance Company.  That company does not sell insurance products in Florida. *See* Lentz ¶7.  The Florida Farm Bureau property and casualty companies are not related to and operate independently from the Farm Bureau property and casualty insurance companies in other states. *Id*. ¶5.

[3] Doc. 5-4, 39-1.

(ii) Were any class members exempt from FLSA overtime requirements?   The already well-developed record confirms these questions cannot be answered on a collective basis.   The record establishes, first, that Plaintiffs and putative class members experienced widely varying levels of supervision and control, such that Plaintiffs will not be able to use common proof to show that all class members were misclassified as independent contractors.   Likewise, the record establishes that Plaintiffs and the proposed class members engaged in widely divergent amounts of outside sales, such that Plaintiffs are unable to show that all class members similarly failed to qualify for the outside sales exemption to FLSA overtime requirements.

This is true regardless of whether the Court affords Plaintiffs' arguments "lenient" scrutiny or something greater, since even under the *Hipp* standard Plaintiffs must make **substantial** allegations providing a **reasonable** basis for the conclusion that members are sufficiently similar to justify the due process implications and outsized costs and burdens inherent in representative litigation.   Plaintiffs cannot successfully negate the powerful evidence submitted by Defendants showing that, on the factors relevant to the similarly situated inquiry, a one-size-fits-all proceeding cannot work in this case.   Plaintiffs have taken the position that this case can be tried collectively because "all agents" sold identical products in identical ways using materials and staff supplied by Defendants, under strict supervision, while largely tied to their desks.   Other agents, however, tell a starkly different story, as do the

AMs who worked alongside the agents. Plaintiffs cannot make allegations substantial enough to overcome the truth, and this Court should not ignore undisputed record evidence.

For these reasons, and those set forth below, Plaintiffs' Motion for Conditional Certification as an FLSA Collective Action and for Court-Authorized Notice Under 29 U.S.C. § 216(b) (Doc. 47) ("Certification Motion" or "Motion") should be denied.

## **FACTUAL BACKGROUND**

The three named Plaintiffs and two opt-ins worked in a tightly packed segment of Defendants' sprawling Florida network of offices, representing just four of Defendants' 94 Florida offices.[4]  Plaintiffs seek certification on identical and conclusory assertions that they and their fellow agents are essentially fungible automatons, following strict rules under intrusive supervision with no autonomy, spending hours at a time in their respective offices that they needed permission (supposedly) to leave.[5]  Yet, if this were truly Plaintiffs' experience, these agents are the ultimate outliers, and startlingly *unrepresentative* of the class they hope to represent.

---

[4] Lentz ¶14, Exh. A.

[5] *Compare* Declarations of Dianna Yoder (Doc. 47-1); Clint Walding (Doc. 47-2); Kelley Williams (Doc. 47-3); Joshua Davis (Doc. 47-4); Richard Butts (Doc. 47-5).

The wide diversity of experiences among contracted Farm Bureau agents is virtually inevitable.  As several AMs testified, they seek agents who want "to build their **own** business using the Florida Farm Bureau platform."  Blair ¶6.[6]  Potential agents need to be able to sell insurance without someone there to "hold their hands" or act as a "babysitter."[7]  Given Florida's size and diversity, a rigid, top-down system is not how Defendants' sales force operates, and certainly not for all putative class members.

The contracts Farm Bureau agents sign also drive class diversity:

> [Y]ou have the right to control your daily activities and means by which the provisions of this contract are carried out … [and] to exercise independent judgment as to the persons from whom applications … will be solicited, and the right to determine the time, place, and manner of soliciting and servicing policyholders. … The Company will not prescribe nor furnish the details of the kind and character of work to be done by you hereunder.

*E.g.*, Heard at Exh. 2 (§2.A.); Lentz at Exh. 1 (§2.A.).  Agents are highly compensated under these contracts, averaging over $136,000 annually in property

---

[6] Higginbotham ¶8 ("I stress with my agents that they are business owners who have the freedom to run their business the way they choose.").

[7] Cothron ¶5; Blair ¶6; Mikell ¶6.

and casualty commissions alone in 2018 (with at least one agent earning over $365,000).[8]

A lack of class cohesiveness is also inherent in the nature of Farm Bureau's broad network within Florida. Farm Bureau's 94 offices are divided geographically into three districts. Lentz ¶13. In the middle is District 2,[9] where the Plaintiffs and opt-ins worked in four geographically close offices. *Id*. ¶¶13-14; Gicalone ¶4. Yet they seek to represent a class of agents literally "all over the map," whose location, geography, customer base, and strategies show that no two agents are "similarly situated" to each other or to Plaintiffs.

A closer review of the agent declarations drives these points home.

---

[8] Lentz ¶15. This excludes life insurance and brokerage commissions, which provide agents additional commission compensation. Warren ¶7.

[9] **District 1** covers the northwestern part of Florida, including the panhandle, and includes counties on the coastline having special insurance needs and restrictions where agents are able to write insurance with brokerage companies, not Florida Farm Bureau. McNeill ¶4. Other parts of District 1 are rural counties where agents write more property and casualty insurance. *Id.* **District 3** includes the entire southern peninsula of the State, with 15 of 23 counties having coastlines and flood zone surveys creating restrictions on insurance offerings in a large portion of this district. Booker ¶7. The coastline counties here tend to be more densely populated than rural counties located in the middle part of the state and have less walk-in business than exists in a rural county. In addition, poor automobile loss ratios in south Florida have made the Company's automobile rates less competitive, requiring south Florida agents to become creative and adapt to a changing insurance environment. *Id.* In short, "[e]very county is different." McNeill ¶4.

Starting in Escambia County in the western most section of the panhandle, agent **Joseph Hetrick** enjoys the freedom afforded him as a Farm Bureau agent, and "love[s]" that he gets to set his own hours. Hetrick ¶3. He is only asked to be in the office on "quote days," which is an opportunity to "get free commission money," but he prefers to meet clients at their homes or for lunch or dinner and otherwise working a varied schedule. *Id.* ¶¶3-9. Mr. Hetrick conducts seventy-five percent of his insurance appointments outside of the office. *Id.* His AM does not tell him how to run his business. *Id.* He is actively involved in his community and networks and advertises constantly. *Id.*

Traveling east, in Suwannee County, agent **Kevin Greene** has served Live Oak for 16 years. Greene ¶2. He affords himself a flexible schedule, accommodating his hobby—fishing—and family time. *Id.* ¶4. He views himself as a business owner who makes decisions about investments and has the freedom to work when and how hard he wants. *Id.* ¶¶3-7. Greene is so devoted to developing relationships to grow his business that his wife teases him when they go out to dinner because he has to stop and "say hello to everyone." *Id.* ¶9. His customers do business with him not necessarily because he sells Farm Bureau products, but because they want to buy from Kevin Greene. *Id.* ¶10.

At the other end of the State in Broward County, former agent and current AM **Raymond Palhegyi** explains that the "best thing about this business is the

freedom of your time." Palhegyi ¶3. In his 27 years with Farm Bureau he has attended all of his children's significant events and taken an active role as their coach. *Id.* His current agents enjoy similar flexibility. *Id.* ¶4. He notes the uniqueness of Broward County, which houses four Farm Bureau offices due to its geography and traffic. *Id.* ¶6. Palhegyi is an entrepreneur; his corporation owns two of the buildings in which those offices are located and leases a third. *Id.*

Agent **Robert Gonzalez**, also from Broward, sets his own schedule, allowing time for fishing and vacations. *See* Gonzalez ¶¶3, 9. He is an employee of his incorporated agency, which also pays a salary and health insurance for a receptionist, and compensates a Customer Service Representative ("CSR") to assist in the business. *Id.* ¶6. No one tells him how to sell insurance. *Id.* ¶18. Due to restrictions on the types of policies he can write in Broward County, outside brokerage accounts for 40% of his business. *Id.* ¶¶15-16.

Agent **Ray Timmons** has served in Miami-Dade County since 2010. Timmons ¶2. He appreciates his autonomy and has "no interest in being an employee." *Id.* ¶4. He works in Homestead, where he grew up, and takes advantage of the unique opportunity his background affords him. *Id.* ¶6. Timmons estimates that 70% of his sales are made at customers' homes or businesses, and 30% are made

in the office.  *Id.* ¶6.  Given his background, he does not need to engage in advertising or formal networking.  *Id.* ¶8.[10]

Even in counties where some Plaintiffs sold insurance, current agents describe a different experience.  Agent **Richard Helms** is in Sumter County, and worked in the same office as Josh Davis.  Helms ¶2.  He enjoys the flexibility afforded by his current position to control his schedule and his business decisions.  *Id.* ¶¶3-5.  He has even paid for his own assistant to help service his clients.  *Id.*

Agent **Robert Tracy** serves in Hernando County and worked in the same office as Yoder.  Tracy ¶2.  Tracy contracted with Defendants after retiring from Publix, where he was employed for 27 years, "because of the long hours."  *Id.* ¶3.  He controls his own schedule, making time for weekly church activities, and says his work "is entirely self-monitored."  *Id.* ¶4.  A "planner," Tracy employs a different sales process depending on the product he is marketing, and is too set in his ways to hire a CSR to assist him with his book of business.  *Id.* ¶¶5-7, 9.  He does not need to advertise because he knows almost everyone in town and relies upon word of mouth, considering himself a "walking billboard."  *Id.* ¶8.

_____

[10] In coastal counties like Miami-Dade, premiums are high and underwriting is often capped, so Timmons must sell policies issued by brokerage companies instead, which constitute 40% of his sales.  He also focuses on commercial insurance in light of his customer base.  He specializes in crop insurance, which requires special skills to sell, spending 50% of his time outside the office doing so.  *Id.* ¶¶ 9, 10.

Even the experiences of the Plaintiffs and opt-ins are not "similar" to each other, much less to other agents around the State. For instance, Plaintiff **Yoder**, by her choice, spent most of her time *inside* the Brooksville office, even devoting office hours to preparing a floor schedule to ensure there was adequate office coverage. Blair ¶¶11-12. In recent years, she was not involved in any networking or community activities. *Id*.

Opt-in **Davis**, in contrast, was a star and "master networker," the type of salesman "who would quote insurance for a tire store when he went to get a new tire." *Id.* ¶13. He spent significant time *outside* the Wildwood office in Sumter County, having invested his own funds on CSRs and secretaries to reduce the burden of office work. *Id.* ¶14. In the Wildwood office, Davis "almost single-handedly [grew] the business … with virtually **no supervision**." *Id.* ¶13.

Plaintiff **Clint Walding** came and went from the Marion County office as he pleased and made his own schedule, rarely staying in the office past 4:00 pm and not coming in at all one day a week. Cothron ¶¶6, 8. Geography and location uniquely impacted his work. Because of the distance between Walding's home and the office, he sold and serviced insurance clients from neighboring Bradford and Alachua counties outside of the Marion County office. *Id*. ¶9.

Walding's work in the large and very busy Marion County office (*id.* ¶4) stands in contrast to plaintiff **Kelley Williams'** experience in the Flagler County

-9-

office, where she was the only agent writing insurance.  Higginbotham ¶4.  And unlike Yoder, Williams "was out of the office about fifty percent of the open office hours."  *Id.* ¶¶6-7.  Her time "was completely in her control" and there were days she never came to the office at all.  *Id.*

Finally, opt-in **Richard Butts** came and went from the Wildwood office quickly, performing poorly for only seven months before leaving.  Blair ¶16.  The only apparent thing that Butts had in common with the other Plaintiffs and opt-ins was that he was contracted as an agent in Gwynn Blair's agency.

As the above discussion shows, as a *factual* matter, no Florida Farm Bureau agent, or handful of agents, should ever be deemed "representative" of Florida Farm Bureau agents *en masse*.  Nor, as set forth below, are Plaintiffs representative as a legal matter.

## STANDARD OF REVIEW

The Eleventh Circuit authorized district courts to use the two-stage inquiry discussed in *Hipp v. Liberty National Life Insurance Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001).  That said, it explained in *Hipp* that "[n]othing … *requires* district courts to utilize this … approach," *id.* at 1219, and recently reconfirmed that position.  *See Mickles v. Country Club Inc.*, 887 F.3d 1270, 1276-77 (11th Cir. 2018).  Instead, the decision "remains soundly within the discretion of the district court."  *Hipp*, 252 F.3d at 1219.  Given the already well-developed record, and despite Plaintiffs'

failure to conduct significant discovery, a "fairly lenient" standard is not warranted. This Court ordered that discovery begin "immediately" four months ago (Doc. 31 at 1), and Plaintiffs have since taken no discovery and avoided responding to discovery in good faith.  Courts are on to that game, and do not reward it.  As a sister court explained, "plaintiffs had the ***opportunity*** to conduct discovery, despite their ***choice*** not to avail themselves of it," and the "rationale [for the lenient standard] disappears ... once plaintiffs have had an opportunity to conduct discovery with respect to defendant's policies and procedures." *Thedford v. Drive In of Evansville, Inc.*, 2014 WL 5520954, at *2 (N.D. Ala. Oct. 31, 2014) (applying "more searching" standard).

The legal standard therefore depends on whether the Court examines the evidence in two stages or one.  If two, the first "notice" stage, while "fairly lenient," is not "invisible" and "cannot be based on the conclusory allegations of a few employees." *Czopek v. TBC Retail Grp., Inc.*, 2015 WL 4716230, at *4-5 (M.D. Fla. Aug. 7, 2015); *Brooks v. Rainaldi Plumbing, Inc.*, 2006 WL 3544737, at *2 (M.D. Fla. Dec. 8, 2006).  Plaintiffs must demonstrate "a reasonable basis for their claim of classwide" injury, through "substantial allegations of class-wide" injury "supported by affidavits which ***successfully engage*** defendants' affidavits to the contrary." *Hipp*, 252 F.3d at 1219.  In conducting that review, the "evidence presented by ***all*** parties should be considered carefully." *Czopek*, 2015 WL 4716230, at *5.  If, however, the Court collapses the inquiry into one stage, *proof*

the putative class is similarly situated, not "substantial allegations," is required. *Zulauf v. Amerisave Mortg. Corp.*, 911 F. Supp. 2d 1266, 1270 (N.D. Ga. 2012) (at second stage, plaintiffs must "demonstrate, by evidence, that all claimants are 'similarly situated'").

It is important to recognize that "[a] court's determination that the evidence shows a particular group of opt-in plaintiffs are similarly situated is a finding of fact." *Morgan v. Family Dollar Stores, Inc*., 551 F.3d 1233, 1260 (11th Cir. 2008). The Court has broad discretion to determine whether the proposed class is "similarly situated" in light of "the nature of the claims and defenses applicable to a particular action." *Gutescu v. Carey Int'l, Inc.*, 2003 WL 25586749, at *10 (S.D. Fla. July 21, 2003). Stated another way, the "certification determination … must be made with an eye toward the substantive claims raised." *Carrera v. UPS Supply Chain Sols., Inc.*, 2012 WL 12860750, at *7 (S.D. Fla. Sept. 14, 2012).

Here, the "claim" is misclassification under the FLSA and the "defenses," for present purposes, are that (i) Plaintiffs have been properly classified as independent contractors; and (ii) if not, Plaintiffs are exempt from overtime requirements under the "outside sales" exemption. The questions on this Motion are, therefore, whether Plaintiffs presented substantial allegations, or clear proof, showing the Eleventh Circuit's "economic realities" test can be applied classwide; and, if so, whether there is a reasonable basis to conclude that every class members' exemption status can be

determined in a common way.  The arguments should be reviewed in light of these questions.

## SUMMARY OF ARGUMENT

The class device is only useful when it enables the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged activity." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Consequently, at "the ***core*** of the 'similarly situated' inquiry is the question whether the issues in the case can be adjudicated collectively." *In re Tyson Foods, Inc.*, 694 F. Supp. 2d 1372, 1378 (M.D. Ga. 2010).

But not just any "common issues" will do.  As the Supreme Court has explained in a related context, "[w]hat matters to class certification ... is not the raising of common ***'questions'***—even in droves—but, rather the capacity of a classwide proceeding to generate common ***answers*** apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011).  Class members are sufficiently cohesive (or "similarly situated") when a "common contention" binding the class "is capable of class wide resolution--which means that determination of its truth or falsity will resolve an issue that is ***central*** to the validity of each one of the claims ***in one stroke.***"  *Id.*[11]

---

[11] While *Dukes* arose in the Rule 23 context, the Eleventh Circuit recognized that "Section 216(b) of the FLSA and Rule 23(b)(3) are animated by similar concerns

Consistent with these teachings, Plaintiffs must show that the common contentions at the heart of their case—that every agent has been misclassified as an independent contractor, and that all are non-exempt—can be resolved in one proceeding. While in the ordinary case this burden may not be "heavy" if applying stage one review, it is a burden *these* Plaintiffs cannot bear. *Hipp*, 252 F.3d at 1219. In their zeal to paint themselves as assembly line-like workers who robotically implement top-down direction from Defendants, Plaintiffs establish only that, on the core classification and exemption questions presented, they are about as *unrepresentative* of the proposed class as any small group of Farm Bureau agents could be.

*First*, Plaintiffs have failed to support a reasonable basis that the "economic realities" test used to determine "employee" status can be applied classwide. That six-factor test "is fact intensive and requires individualized analysis." *Demauro v. Limo, Inc.*, 2011 WL 9191, at *3 (M.D. Fla. Jan. 3, 2011). The record, particularly

---

about the efficient resolution of common claims." *Calderone v. Scott*, 838 F.3d 1101, 1103-07 (11th Cir. 2016); *MacGregor v. Farmers Ins. Exch.*, 2011 WL 2981466, at *4-5 (D.S.C. July 22, 2011) (applying "illuminating" reasoning of *Dukes* to determine whether class members were similarly situated in FLSA collective action); *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, 2011 WL 4351631, at *8-11 (W.D.N.C. Sept. 16, 2011) (denying conditional certification, citing *Dukes*); *Adams v. Hy-Vee*, No. 11-00449, Doc. 72, at 8 (W.D. Mo. May 22, 2012) (applying Dukes analysis denying conditional certification); *Ruiz v. Serco, Inc.*, 2011 WL 7138732, at *6-7 (W.D. Wis. Aug. 5, 2011) (same).

on the issue of how much control Farm Bureau exercised (fundamental to this analysis), shows far too much variation for collective resolution.

*Second*, Plaintiffs failed to support a reasonable basis that each Plaintiffs' exemption status can be resolved collectively.  ***Every single*** agent or manager who has provided testimony, including Plaintiffs, has explained that his or her work and every other Farm Bureau agent's consists of a ***mix*** of office and outside sales work. *See* Section I.B, *infra.*  The testimony also confirms that the ***amount*** of outside sales work varies by class member.  Because "Plaintiff's broad class definition … includes both exempt and non-exempt employees," the motion should be denied.  *Rife v. Fronton Holdings, LLC*, 219 F. Supp. 3d 1256, 1261 (S.D. Fla. 2016).

*Third*, five agents crammed into a relatively small segment of Florida are not representative of every agent in Florida given the state's size, geography, and diversity.

*Fourth*, and in the alternative, Plaintiffs do not satisfy the standards required by Rule 23, the true governing standard for all representative litigation.

## ARGUMENT AND AUTHORITIES

## I.   PLAINTIFFS FAILED TO DEMONSTRATE THAT THE PUTATIVE CLASS MEMBERS ARE SIMILARLY SITUATED

While notice can facilitate the "efficient resolution in one proceeding of common issues," which *Hoffman-LaRoche* requires, "alerting those who cannot ultimately participate in the collective [action] 'merely stirs up litigation,' which is

what *Hoffman-La Roche* flatly proscribes." *In re JPMorgan Chase & Co.*, 916 F.3d 494, 502 (5th Cir. 2019).  To stay within *Hoffman La-Roche*'s bounds, courts make clear that the "similarly situated" inquiry is not conducted "in a vacuum," and surface similarities, like whether all class members were classified as independent contractors, held "the same position," or had similar "duties" or "pay provisions" will not do.  *Demauro*, 2011 WL 9191, at *3; *Morgan*, 551 F.3d at 1242, 1263; *Andel v. Patterson-UTI Drilling Co., LLC*, 280 F.R.D. 287, 290 (S.D. Tex. 2012).  The test instead is whether the proposed class is "similarly situated" given "the nature of the claims and defenses applicable to a particular action." *Gutescu*, 2003 WL 25586749, at *10.  To make this determination, the Court must consider the liability analysis that the fact-finder will undertake on the merits, and evaluate whether the Court can resolve those merits in one proceeding.  *Andel*, 280 F.R.D. at 289-90.

Crediting Plaintiffs' allegations, alongside Defendants' evidence, shows Plaintiffs are the ***antithesis*** of representative Plaintiffs, with their relevant experiences ***dissimilar*** to the mainstream Florida Farm Bureau contracted agent. And, a closer look at the testimony from eyewitnesses to the Plaintiffs' and opt-ins' true experiences shows that, despite the sheen of similarity provided by their cookie-cutter declarations, Plaintiffs themselves are not even a cohesive group.

A.    **Individualized Determinations Regarding Independent Contractor Status Preclude Certification**

"At the heart" of a misclassification case is "the economic realities test," which courts in this Circuit use to determine whether a worker should be classified as an "independent contractor or an employee for FLSA purposes." *Pena v. Handy Wash, Inc.*, 2015 WL 11713032, at *10 (S.D. Fla. May 22, 2015). In conducting this inquiry, courts examine: (1) the alleged employer's "control" over the work performed; (2) the alleged employee's skill-based "opportunity for profit;" (3) the alleged employee's "investment" in the business; (4) "special skill[s]" associated with the tasks at hand; (5) the "permanency" and "duration" of the relationship; and (6) the "integral" nature of the work. *Demauro*, 2011 WL 9191, at *3.[12]

This multi-part inquiry is "fact intensive." Courts frequently deny motions for conditional certification in misclassification cases because the "individualized analysis" needed "to determine whether each [worker] is an independent contractor or an employee for FLSA purposes" is not appropriate for determination on a class wide basis. *Demauro*, 2011 WL 9191, at *3-4 (citing cases); *see also Bedoya v.*

---

[12] The Eleventh Circuit has cited with favor the Second Circuit's conclusion in *Lorenz Scheider Co., Inc. v. N.L.R.B.*, 517 F.2d Cir. 1975) that, while essential to an insurance company's business, insurance agents "are not thereby made employees," since this "is also true in many relationships which are undisputedly that of a company to independent contractors." *N.L.R.B. v. Associated Diamond Cabs, Inc.*, 702 F.2d 912, 924 (11th Cir. 1983).

*Aventura Limousine & Transp. Serv., Inc.*, 2012 WL 1933553, at \*5 (S.D. Fla. Apr. 10, 2012) (denying conditional certification on this ground); *West v. Verizon Commc'ns, Inc.*, 2009 WL 2957963, at \*6-7 (M.D. Fla. Sept. 10, 2009) (same).[13]

As the evidence in the following table shows, Plaintiffs' experiences with Farm Bureau, if credited, diverge from the typical experience of putative class members.

| The Experiences Of Florida Farm Bureau Agents Vary Across The Class | | |
|---|---|---|
| | Plaintiffs' Alleged Experience | Other Agents' Experiences |
| **Office Hour "Requirements"**[14] | We "had to work at the office during business hours," and "be in [our] offices Monday–Friday for the full workday, unless they are conducting business errands or have preapproved time off." | <u>Robert Tracy, Agent</u>: "I can work ***whenever I want***." <br> <u>Joseph Hetrick, Agent</u>: "I … ***set my own hours***." <br> <u>Richard Helms, Agent</u>: Has no "***set office hours***." <br> <u>Ray Timmons, Agent</u>: Has ***no "specific hours."*** <br> <u>Raymond Palhegyi, former Agent, current AM</u>: Had no "pressure … to be in the office at certain times." <br> <u>Kevin Greene, Agent</u>: Had "control |

[13] *See also In re FedEx Ground Package Sys., Inc., Emp. Practices Litig.*, 662 F. Supp. 2d 1069, 1083 (N.D. Ind. 2009) (same); *Andel*, 280 F.R.D. at 290; *cf. Carrera*, 2012 WL 12860750, at \*8 (noting, at decertification stage, "courts have ***typically*** denied collective certification of FLSA actions which allege employee/independent-contractor misclassification" in light of individualized inquiry required).

[14] Quotes are from the Declarations in the Appendix.  For this section, Yoder ¶¶4, 7 (identical in each cited part to the declarations of the other Plaintiffs/opt-ins); Tracy ¶4, Hetrick ¶3, Helms ¶3; Timmons ¶5; Gonzalez ¶3.

| The Experiences Of Florida Farm Bureau Agents Vary Across The Class | | |
|---|---|---|
| | Plaintiffs' Alleged Experience | Other Agents' Experiences |
| | | over my schedule …" <br><br> <u>Robert Gonzalez, Agent</u>:  "I … come to and leave my office when I please." |
| **Diversity of Services and Manner Performed**[15] | We "perform the *same* services … in *similar or identical* ways." | <u>Timmons, Agent</u>: "Every agent has his or her *own way* of selling insurance." <br><br> <u>Greene, Agent</u>: Has his "*own way* to sell insurance." <br><br> <u>Todd Gicalone, former Agent, current DSM</u>: "Selling is a personality; it is *different* for each agent." <br><br> <u>Sean McNeill, former Agent, current AM</u>: "Developing relationships and soliciting business is *unique* to each agent." <br><br> <u>Craig Mikell, AM</u>: "Each agent operates *differently*." |
| **Rigidity of Policies and Processes**[16] | In the named Plaintiffs' experience, "every facet of our duties is set out in contracts, manuals, and guides that [we were] required to follow." | <u>Palhegyi, former Agent, current AM</u>: Sales strategies are "completely *up to the agent*." <br><br> <u>Greene, Agent</u>: "*No one* tells me that how to run my insurance business." <br><br> <u>McNeill, Former Agent, current DSM</u>: "How agents sell insurance is *up to the individual agent*." <br><br> <u>Gonzalez, Agent</u>:  While company offers training and motivation, "they did not teach me how to sell insurance |

---

[15] Yoder ¶¶4, 7; Timmons ¶5, 8; Greene ¶4; Gicalone ¶8; McNeil ¶8; Mikell ¶7.

[16] Yoder ¶9; Palhegyi ¶7; Greene ¶7; McNeil ¶9; Gonzalez ¶18; Mikell ¶6.

| The Experiences Of Florida Farm Bureau Agents Vary Across The Class | | |
|---|---|---|
| | **Plaintiffs' Alleged Experience** | **Other Agents' Experiences** |
| | | and I have developed my own way of doing things." <br><br> <u>Mikell, AM</u>: He does "not tell the agents … how to sell insurance." |
| **Degree of Supervision**[17] | We were "managed by Defendants' agency and district-sales managers," who "closely supervise" and exercised "substantial control over" our work. | <u>Tracy, Agent</u>: He is "***entirely self-monitored***." <br><br> <u>Helms, Agent</u>: "I am ***not micromanaged***." <br><br> <u>Mikell, AM</u>: His "management style is '***hands off***.'" <br><br> <u>Brandon Higginbotham, AM</u>: "I ***do not control*** how the agents in my office sell to or service their customers." <br><br> <u>Gwynn Blair, AM</u>: Davis had "virtually no supervision as the agent in charge of [the Wildwood] office." |
| **Control over Time Off**[18] | Defendants' controlled agents time off, and the named Plaintiffs were "discouraged from taking time off work" | <u>Hetrick, Agent</u>: Needs no permission "to take time off." <br><br> <u>Timmons, Agent</u>: Needs no permission "to take … time off." <br><br> <u>Palhegyi, former Agent, current AM</u>: Needed no permission for "vacation." <br><br> <u>Greene, Agent</u>: No need to ask for "time off." <br><br> <u>Gonzalez, Agent</u>: Makes own schedule |

---

[17] Yoder ¶13; Tracy ¶4; Helms ¶3; Mikell ¶5; Higginbotham ¶8; Blair ¶13.

[18] Yoder ¶7; Hetrick ¶3; Timmons ¶5; Palhegyi ¶3; Greene ¶4; Gonzalez ¶9.

| The Experiences Of Florida Farm Bureau Agents Vary Across The Class | | |
| --- | --- | --- |
| | Plaintiffs' Alleged Experience | Other Agents' Experiences |
| | | and needs no permission for time off. |
| **Entity Supplying Facilities and Staff**[19] | In their experience, "Defendants provide the physical-facilities support" including the "buildings" and "front-office staff." | <u>Palhegyi, former Agent, current AM</u>: He owns, in whole or part, the buildings in which two Farm Bureau offices are located, and co-leases another.  "All" expenses "are covered by me and/or the Broward County agents." <br><br> <u>Hetrick, Agent</u>: Is "planning to hire a CSR, and ***"will pay" CSR's*** "salary." <br><br> <u>Helms, Agent</u>: "***I have hired and paid*** for my own … CSR." <br><br> <u>Gonzalez, Agent</u>: He "leases" several employees from his AM and is "part owner" of building. <br><br> <u>McNeill, Former Agent, DSM</u>: "As an agent, ***I often employed and paid for my own CRS.***" |

As these excerpts and the full declarations establish, individualized issues predominate as a result of the factors necessary to apply the economic realities test, such as control, supervision, opportunity for profit, investment, and special skills. Thus, conditional certification should be denied.  *Demauro*, 2011 WL 9191, at *3 ("the individualized analysis needed to determine whether each [class member] is an

---

[19] Yoder ¶11; Palhegyi ¶6; Hetrick ¶11; Helms ¶5; Gonzalez ¶¶6, 8; McNeill ¶9.

independent contractor or employee for FLSA purposes precludes class certification").

**B.    Individualized Determinations Regarding FLSA Exemptions Preclude Certification**

An employee qualifies for the "outside sales" exemption if (i) her "primary duty" is "making sales" and (ii) she is "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a).  "Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work."  29 C.F.R. § 541.503(a).  The Department of Labor has concluded that sales related activity outside the office only "one or two hours a day, one or two times a week" can satisfy the second prong of the exemption.  Wage Hour Op. Ltr. No. FLSA2007-2 (Jan. 25, 2007).  A "preliminary step[] toward the end goal" of sales also counts for purposes of the exemption.  *Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 398 (9th Cir. 2011).

Each Plaintiff and opt-in concedes he or she engaged in *some* outside sales work.  As they acknowledge, "Agents are … required to meet with current policyholders for **hours at a time**."  *E.g.*, Yoder ¶11.  "Agents must photograph[] the properties of property policyholders," *id.*, were required to conduct "business errands" outside the office, *id.* ¶7, and met with potential customers to discuss "their insurance needs" and to "help complete applications."  *Id.* ¶10.

The time each agent devotes to outside sales will vary by agent, as each individually decides how much time to devote to outside sales.  *See, e.g.*, Gicalone ¶8 ("The percentage of time an agent works inside or out of the office … is unique, and … **all over the board**.").  The record reflects that every agent's approach to outside sales is different.  *See* Timmons ¶6 ("70% of my sales are made" **outside** the office, "and 30% are made in the office."); Hetrick ¶6 ("Seventy-five percent of my appointments … are at clients' homes."); McNeill ¶7 (When an agent, he "*rarely* met customers in his [prior] office."); Greene ¶6 ("I often leave the office at different times during the day to develop and/or service my book of business."); Gonzalez ¶11 (schedules meetings with clients outside of the office two to three times per week); Tracy ¶5 ("Some days I set aside for appointments … [o]n other days I may spend more time in the office…").  Eyewitness testimony also establishes that the amount of outside sales work varied by each Plaintiff.  *Compare* Blair ¶11 (Yoder "wasn't the type of agent who left the office much during the day, seeming content to take walk-in … business.") *with* Higginbotham ¶6 (Williams "was out of the office about fifty percent of the open office hours.").

The evidence, accordingly, shows significant outside sales activity (as one would expect from insurance agents whose primary job is selling insurance) and far too much variance on the exemption inquiry to allow resolution based on common evidence.  Rather, the exemption issue will need to be resolved through individual

examination of the unique facts relevant to each agent. *See Tussing v. Quality Resources, Inc.*, 2009 WL 4350253, at *3 (M.D. Fla. Nov. 25, 2009) (denying conditional certification; "[T]he mixing of both exempt and non-exempt employees in a class does not lend itself to proceeding by way of a conditional class because it is overbroad."); *Rife*, 219 F. Supp. 3d at 1261 (same); *Tyler v. Payless Shoe Source, Inc.*, 2005 WL 3133763, at *5-6 (M.D. Ala. Nov. 23, 2005) (same).

### C.   Plaintiffs Failed To Establish That Conditional Certification Of A Statewide Collective Action Is Warranted

The five Plaintiffs and opt-ins worked out of just four neighboring counties in north central Florida, out of the 94 agency offices in Florida. Lentz ¶¶13-14 & Exh. 6. Plaintiffs have put forth no evidence demonstrating that there are aggrieved potential opt-ins *outside* of their distinctive geographic region or District. *See Zamis v. Duffy's Mgmt., Inc.*, 2012 WL 13134531, at *2 (S.D. Fla. Nov. 7, 2012), *rep. & rec. adopted*, 2012 WL 13134530 (S.D. Fla. Nov. 30, 2012) (denying conditional certification where plaintiff had "not shown that interest spans the full, state-wide geographical scope of the proposed collective"); *Baum v. Shoney's Inc.*, 1998 WL 968390, at *3 (M.D. Fla. Dec. 3, 1998) (denying conditional certification where "Plaintiffs ha[d] not provided any evidence that employees in restaurants outside of Orange County are similarly situated to Plaintiffs").

Nor have Plaintiffs demonstrated they are similarly situated to agents working out of different offices, different counties, or different Districts. Rather, the record

shows there are significant variations in how Florida Farm Bureau agencies and agents operate across the state.  For instance, agents in coastal counties, like Miami-Dade and Broward, face unique caps and limitations on the property insurance they can write due to hurricane exposure and rely heavily on brokerage agencies and third-party carriers to fulfill their clients' needs.  *See* Timmons ¶9 (about "40% [of his business] is written through brokerage companies."); Gonzalez ¶16 (homeowner's insurance "restriction(s) [are] unique to South Florida.").  Plaintiffs' cookie-cutter declarations do nothing to show that the broad, statewide class they seek consists of similarly situated current and former agents, and when juxtaposed against Defendants' evidence, it is clear that such a class does not exist.

## II.   IN THE ALTERNATIVE, THE COURT SHOULD DENY THE MOTION BECAUSE IT FAILS TO SATISFY RULE 23'S GOVERNING STANDARD FOR *ALL* FORMS OF REPRESENTATIVE LITIGATION

Plaintiffs' motion should be denied regardless of whether the Court requires substantial allegations or proof on the similarly situated inquiry.  If the Court finds otherwise, however, it should determine whether Plaintiffs' showing satisfies Rule 23's standards because those standards, in fact, govern the inquiry as a matter of law.

To be sure, the Eleventh Circuit has stated that (i) Section 216(b)'s requirements "are independent of, and unrelated to" Rule 23's requirements, and (ii) by imposing an "opt-in" procedure, Congress "impliedly rejected the Rule 23 class action procedures applicable to Title VII actions."  *Grayson v. K Mart Corp.*,

79 F.3d 1086, 1106 (11th Cir. 1996).   There are strong arguments that these contentions should not bind the Court.   The first statement was immediately preceded by the caveat "[a]lthough *not at issue* in this case," so was *dicta* by definition.   *Id.* at 1096 n.12.   The second was made while ruling on "whether ADEA opt-in actions should be governed by the tolling principle of the" FLSA or of Title VII, a question absent here.   *Id.* at 1105-06.   Nonetheless, courts have generally accepted these statements as the law of this Circuit.

If the Court deems itself bound by *Grayson* not to apply Rule 23, and also rules against Defendants on the similarly situated inquiry, Defendants submit this argument in good faith for a change in law.   The argument in favor of Rule 23's application is sound, and Defendants reasonably believe the Eleventh Circuit, as necessary, would reconsider the issue.

### A.   Rule 23 Governs "All" Representative Proceedings, Including Those Brought Pursuant to the FLSA

The sole indication in § 216(b) regarding how a collective action is to proceed is the following:

> An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer …
> by any one or more employees *for and in behalf of himself or themselves and other employees similarly situated*.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

The FLSA, however, is silent about the procedures that should be used to determine

when such a representative action is permissible on behalf of others "similarly situated."  When district courts use the two-stage process to authorize notice, the Eleventh Circuit has recognized that a "representative class" is created and "[t]he action proceeds through discovery as a *representative* action."  *Mickles*, 887 F.3d at 1276.

However, Rule 23(a) expressly states that "[o]ne or members of a class may sue or be sued as representative parties on behalf of all members ***only if***" specific requirements are satisfied.  These Federal Rules "govern the procedure in ***all*** civil actions and proceedings in [federal] courts except as stated in Rule 81."  Fed. R. Civ. P. 1.  And Rule 81 does not exempt the FLSA from the Federal Rules.

Moreover, the Rules Enabling Act states that "[a]ll laws in conflict with [the Federal Rules] shall be of no further force or effect after such rules have taken effect."  28 U.S.C. § 2072(b).  This "Abrogation Clause," reflects Congress' intent that the Rules supersede pre-existing procedural rules.  28 U.S.C. § 2072(b).  Laws enacted after the Federal Rules take precedence *only to the extent* they conflict with the Rules.

The Federal Rules were promulgated in 1938, after the FLSA was enacted. The Portal-to-Portal Act, which added the FLSA's "consent" requirement, was enacted in 1947, and the modern form of Rule 23 was added in 1966.  At that time, the Advisory Committee noted that Rule 23 was not intended to change § 216(b)'s

requirement that an employee file a consent to join a class. *See* Fed. R. Civ. P. 23, Adv. Comm. Notes ("The present provisions of 29 U.S.C. § 216(b) are not intended to be affected by Rule 23, as amended.").

The upshot of the timing and substance of these provisions is that Rule 23 governs all representative actions absent an irreconcilable conflict. Applying these principles to the FLSA means that Section 216(b)'s opt-in provision prevails over Rule 23's conflicting opt-out provision. But Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, and (as relevant here) Rule 23(b)(3)'s predominance requirement, do *not* conflict with § 216(b). FLSA representative actions, accordingly, remain subject to Rule 23's other requirements.

Courts have gone astray by according § 216(b)'s opt-in requirement too much relevance. That provision is a rule limiting who may become a member of the "class" in an FLSA collective action. *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing[.]"). No statute, rule, or Supreme Court opinion suggests that the vast law developed to enhance the fairness and efficiency of representative litigation ought not apply to the FLSA.

Such a construction is inherently unreasonable. By this reading, for example, plaintiffs alleging *racial* discrimination must satisfy the rigorous standards of Rule 23, while plaintiffs alleging *age* discrimination need not, or that plaintiffs alleging

*physical* injury by their employer must satisfy Rule 23, while those alleging *economic* injury, through non-payment of overtime, do not.  The two-stage inquiry, as practiced, is not a proper use of the Court's discretion, and is contrary to the Federal Rules.

### B.   Application Of Rule 23 Better Serves The Due Process, Fairness, and Efficiency Concerns Intrinsic To Representative Litigation

Section 216(b) does not itself contemplate a two-stage process, much less one where the first stage, so impactful to the litigation, is "fairly lenient."  While the lenient standard is supposedly leavened by the "conditional" nature of the certification at stage one, it is this singular decision—temporary or not—that is the central driver of costs and (often unwarranted) "intense pressure to settle" on defendants.  *See, e.g.*, *Parrilla v. Allcom Constr. & Installation Servs., LLC*, 688 F. Supp. 2d 1347, 1350 (M.D. Fla. 2010).

The two-stage procedure is also inefficient.  As the *Hipp* Court observed, "[b]ased on [its] review of the case law, *no* representative class has *ever* survived the second stage of review."  252 F.3d at 1218.  Allowing a "lenient" "conditional" certification at stage 1, resulting in months or years of costly discovery, followed by decertification at stage 2, should give district courts pause.  Permitting certification without proof that the case can be tried as a representative action, as required under Rule 23, results in a grossly inefficient process and a waste of party and judicial resources.  The Court's discretion can be put to better use.

Rule 23 and case law interpreting it provide guideposts to district courts navigating the inherent due process concerns raised by representative litigation. Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Dukes*, 564 U.S. at 348. To justify that departure, and provide fairness to defendants (stripped of their right to confront all accusers and take evidence from each of them), the Rules contain aggregate litigation principles that should be honored. As the Eleventh Circuit explained: "with great power comes great responsibility; the ***awesome power*** of a district court [to certify a class action] must be 'exercised within the framework of rule 23." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016). That power and responsibility does not change merely because the FLSA is in play.

As the Supreme Court has explained, Rule 23's "procedural safeguards" are "grounded in due process," and must be respected, lest parties' rights be left at the mercy of "amorphous balancing test[s]" created by courts. *Taylor v. Sturgell*, 553 U.S. 880, 898, 901 (2008). The two-stage process is one such "amorphous" test that is irreconcilable with due process, which requires a "rigorous analysis" to ensure, among other things, that common questions of law or fact exist and predominate over individual questions. *Dukes*, 564 U.S. at 349-51.

Requiring only "substantial allegations" of similarity among class members is no substitute. That standard is not permitted by Rule 23 nor authorized by statute,

-30-

and does not honor or enhance the fairness or efficiency required for proper representative actions.

### C. While The Two-Stage Methodology Is Prevalent, Courts Employing More Reasoned Analysis Conclude That Rule 23 And Its Principles Should Apply

While the two-stage process is the majority process, a number of courts agree that Rule 23 should govern.  *See Shushan v. Univ. of Colo. at Boulder*, 132 F.R.D. 263, 266 (D. Colo. 1990) ("[I]t does not seem sensible to reason that, because Congress has effectively directed the courts to alter their usual course and not be guided by rule 23's 'opt-out' feature in ADEA class actions, it has also directed them to discard the compass of rule 23 entirely and navigate the murky waters of such actions by the stars or whatever other instruments they may fashion."); *Burns v. Vill. of Wauconda*, 1999 WL 529574, at *2 (N.D. Ill. 1999) ("The Court agrees with the analysis in *Shushan*"); *Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010) (importing Rule 23's predominance prong into certification analysis); *St. Leger v. A.C. Nielsen Co.*, 123 F.R.D. 567, 569 (N.D. Ill. July 15, 1988) (similar); *Gebhard v. GAF Corp.*, 59 F.R.D. 504, 507 (D.D.C. 1973) (assuming Rule 23 applies and finding requirements not met).

*Shushan* is the leading case.  It rejected the notion that Rule 23 is inapplicable simply in light of § 216's opt-in procedure, deeming the limited conflict a "*non sequitur.*"  132 F.R.D. at 266.  The court noted that before Rule 23 was amended in

1966, courts "applied rule 23 and treated section 216 cases as 'spurious' …under the then-existing version of the rule." *Id.* at 266-67.  Congress made no effort to change this in 1966 or any time thereafter.  *Shushan* also found that the procedures in Rule 23 "allow effective disposition and management of the litigation," *id.* at 267, and that Rule 23 protects opt-in plaintiffs, who are as much entitled to protection as class members in Rule 23 actions.  *Id.*  These considerations were amplified in *Hoffman-La Roche*, which made the § 216(b) class action look "more like the familiar class action under rule 23 than a permissive joinder device."  *See id.* at 268.  Ultimately, the court could not

> accept the extraordinary assertion that an aggrieved party can file a complaint, claiming to represent a class whose preliminary scope is defined by him, and by that act alone obtain a court order which conditionally determines the parameters of the potential class and requires discovery concerning the members of that class.  Before I conditionally determine the scope of the class, plaintiffs will need to satisfy me that there exists a definable, manageable class and that they are proper representatives of the class.

*Id.* at 268.  The court's reasoning is sound, and applies equally here.

### D.   Plaintiffs Do Not Satisfy Rule 23's Requirements

When applying Rule 23, the movant "must affirmatively demonstrate his compliance with Rule 23" by proving that the requirements are "*in fact* satisfied" following a "rigorous" analysis.  *Brown*, 817 F.3d at 1233.  As discussed throughout this brief, Plaintiffs rely on copy-cat declarations filled with enough trivia to give

them length but little substance.  They are rife with hearsay and pontification not grounded in personal knowledge.  Plaintiffs do not address whether their "common contention[s]" have "common answers" so that their claims can be resolved "in one stroke."  *Dukes*, 564 U.S. at 349-50.  They do not attempt to reconcile their idiosyncratic experiences relative to their peers with the "typicality" standard, or explain why they, despite appearing to be outliers, are "adequate" representatives. They ignore predominance.

To be sure, as demonstrated above, Plaintiffs' failure on two of these points—commonality and predominance—provide two of the reasons their motion fails even under "fairly lenient" scrutiny, because "Section 216(b) of the FLSA and Rule 23(b)(3) are animated by similar concerns about the efficient resolution of common claims."  *Calderone*, 838 F.3d at 1103-04.  But if the Court finds that Plaintiffs have met their "lenient" burden, the Court should test the Motion against Rule 23's standards and reject it.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Conditional Certification and for Court-Authorized Notice should be denied.

Dated:  October 29, 2019

/s/ Lori R. Benton
Aaron L. Zandy (FL Bar No. 0125271)
azandy@fordharrison.com
Lori R. Benton (FL Bar No. 708429)
lbenton@fordharrison.com
Bret C. Yaw (FL Bar No. 0100445)
byaw@fordharrison.com
FORD & HARRISON LLP
300 South Orange Avenue, Suite 1300
Orlando, Florida 32801
Telephone:  (407) 418-2300
Facsimile:   (407) 418-2327

*Attorneys for Defendants Florida Farm
Bureau Casualty Insurance Company,
Florida Farm Bureau General Insurance
Company and Southern Farm Bureau
Casualty Insurance Company*

Respectfully submitted,

/s/ Markham R. Leventhal
Markham R. Leventhal
(FL Bar No. 616140)
Irma Reboso Solares
(FL Bar No. 797073)
isolares@carltonfields.com
Stephanie A. Fichera
(FL Bar No. 55813)
sfichera@carltonfields.com
CARLTON FIELDS, P.A.
100 S.E. Second Street, Suite 4200
Miami, Florida 33131-2113
Telephone:  (305) 530-0050
Facsimile:   (305) 530-0055

and

Cathleen Bell Bremmer
(FL Bar No. 813028)
cbell@carltonfields.com
CARLTON FIELDS, P.A.
4221 West Boy Scout Boulevard,
Suite 1000
Tampa, Florida 33607-5780
Telephone:  (813) 223-7000
Facsimile:   (813) 229-4133

*Attorneys for Defendant Southern Farm
Bureau Life Insurance Company*

-34-

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(F), the undersigned counsel hereby certifies that this memorandum contains 7,881 words, as calculated by the electronic system on which this document was created, exclusive of case style, tables, signature block and certificates of compliance and service.

/s/ Markham R. Leventhal

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 29th day of October 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send an electronic notice to the authorized CM/ECF filers listed below.

/s/ Markham R. Leventhal

120059038

-35-